# EXHIBIT A

**[J-53-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : | No. 31 EAP 2023 |
| | : | |
| | : | Petition for Certification of Question |
| Appellant | : | of State Law from the United States |
| | : | Court of Appeals for the Third |
| | : | Circuit at No. 22-1587 |
| v. | : | |
| | : | ARGUED:  September 11, 2024 |
| | : | |
| THOMAS E. PROCTOR HEIRS TRUST, UNDER DECLARATION OF TRUST DATED OCTOBER 28, 1980, WHICH IS RECORDED IN SULLIVAN COUNTY IN BOOK 1106, AT PAGE 879, ITS SUCCESSORS AND ASSIGNS, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE MUNDY**                                    **DECIDED: May 30, 2025**

In 1908, the Bradford County Commissioners sold an unseated tract of land, known as the Haines Warrant, to Calvin H. McCauley, Jr. at a tax sale.  More than 100 years later, the Pennsylvania Game Commission, a successor in interest to McCauley, initiated the current litigation to determine ownership of various tracts of land in central Pennsylvania.  As part of that litigation, the Third Circuit Court of Appeals has asked this Court whether, based on the record provided here, the 1908 tax sale constituted a title wash, thereby divesting the owners of the Haines Warrant's subsurface estate of their interest.  After a careful review of the record and the law applicable at the time, we determine that the 1908 tax sale did not constitute a title wash but, rather, acted as a

mere redemption of taxes owed and, as such, did not divest the subsurface owners of their interest in the Haines Warrant.

## I.    Background

### A.    Legal Background

In *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016), we issued a "comprehensive and scholarly" opinion thoroughly setting forth the land tax laws of the Commonwealth during the 19th and first half of the 20th century. *Herder Spring*, 143 A.3d at 379 (Todd, J., concurring). A brief review of some pertinent concepts will help place the current issue in proper context. As discussed in *Herder Spring*, prior to 1947, Pennsylvania distinguished between seated and unseated land. Seated land "was property that had been developed with residential structures, had personal property upon it that could be 'levied upon for the tax due', or was producing regular profit through cultivation, lumbering, or mining." *Id.* at 363 (citing ROBERT GREY BUSHONG, PENNSYLVANIA LAND LAW, Vol. 1, § 469 (II) at 500-501 (1938)). Unseated land, on the other hand, was considered "wild" and included any land that did not meet the requirements for being seated. *Id.* The owners of unseated land often did not live nearby and were not always known, which made it difficult for county officials to obtain personal service and collect taxes. *Id.* at 364. These difficulties led the Commonwealth to develop different sets of land tax laws for seated and unseated land. *Id.*

One of the initial differences between the treatment of the different types of land was that failure to pay the taxes assessed on unseated land could result in the property being sold at a tax sale.[1]  Pursuant to the Act of 1804:

---

[1] The legislature made seated land eligible for tax sale under certain circumstances in 1844. *See Scott v. Bell*, 25 A.2d 308, 310 (Pa. 1942) ("By § 41 of the Act of April 29, 1844, P.L. 486, 72 P.S. § 5984, provision was made for the sale of all real estate on which sufficient personal property could not be found to pay the taxes, provided the owners had neglected or refused to pay the same for the space of two years.").

> [S]ales of unseated land, for taxes that are now due … shall be in law and equity valid and effectual, to all intents and purposes, to vest in the purchaser or purchasers of lands sold as aforesaid, all the estate and interest there, that the real owner or owners thereof had at the time of such sale, although the land may not have been taxed or sold in the name of the real owner.

*Id.* at 366 (quoting Act of 1804, § 5). Such tax sales extinguished all previous titles and "exclude[d] 'all other claimants to the land of a prior date.'" *Id.* (citing *Reinboth v. The Zerbe Run Improvement Co.*, 29 Pa. 139, 145 (Pa. 1858); *Caul v. Spring*, 2 Watts 390, 396 (Pa. 1834)). The process of extinguishing all prior titles and vesting title in the tax sale purchaser is known as title washing. The law, however, discouraged tax sale purchasers from improving their land because tax sales were rarely upheld as "courts required a purchaser of unseated land at a tax sale to demonstrate 'an exact and literal compliance with every direction of the law' related to the sale, including even the election returns of the relevant county officers." *Id.* at 365 (quoting *Morton v. Harris*, 9 Watts 319, 322 (Pa. 1840)). In an attempt to correct this situation and encourage development of unseated land, the legislature enacted the Act of 1815 "to change the burden of proof 'to substitute the presumption that everything was rightly done, for the proof that it was rightly done.'" *Id.* (quoting *Morton*, 9 Watts at 323).[2] This change would give tax sale purchasers

---

[2] In *Morton,* the Court explained that prior to the Act of 1815, while hundreds of tax sales occurred, none were upheld except in instances where the applicable statute of limitations barred reversal of the sales. *Morton*, 9 Watts at 322. According to the Court, the reason for the failure of affirmance of tax sales was the courts' position that

> to vest a title in the purchaser of lands sold for taxes, an exact and literal compliance with every direction of the law or laws was necessary, and that, from the return of the election of the assessors, to the deed, every requisite of every act must be shown by the original written paper in each case to have been in strict conformity with the law, it became necessary not only that a purchaser should be able, at the time of his purchase, to prove all that was required, but he must be able to prove everything for twenty-one years after his taking possession.

(continued…)

confidence that they could make improvements to the unseated land without the risk of the tax sale being overturned, although an owner could still rebut this presumption with direct evidence that the elements were not met. *Id.* The Act of 1815 additionally instituted a two-year redemption period for owners of unseated land to pay the unpaid taxes plus costs and fees and recover the land sold at the tax sale. *Id.* at 366 (citing Act of 1815, § 4, set forth at 72 P.S. § 6091).

In *Powell v. Lantzy*, 34 A. 450 (Pa. 1896), this Court, without using the exact term, "explained the rationale underlying title-washing[.]" *Id.* at 367. There, the Court addressed a situation where the surface owner of unseated land purchased the entire property at a tax sale precipitated by the failure to pay taxes assessed on the property prior to the surface owner's ownership.[3] While affirming the prior surface owner's title in the entire property against a challenge from the prior subsurface owner, we stated, as relevant to the case at bar, and discussed in detail below,

> [t]he rule that one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest, rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty.

*Powell*, 34 A. at 451 (the "Powell Rule").

---

*Id.* The *Morton* court reiterated that the purpose of the Act of 1815 was to remedy this perceived evil. The Act, however, was not sufficient to save the tax sale at issue in that case. There, four tracts were advertised and sold together, even though the assessment was of four separate tracts. *Id.* at 325. The court determined that, while "[t]he Act of 1815 [ ] was intended to remove all the difficulties known to stand in the way of those who purchased lands sold for taxes," the Act did not apply to instances where multiple separate tracts were advertised and sold as one tract at tax sale. *Id.* at 327.

[3] "As was true of seated land, this Court concluded that unseated land could be severed into surface and subsurface estates, which could be separately assessed, taxed, and, if necessary, sold at tax sale." *Herder Spring*, 143 A.3d at 364 (citing *F.H. Rockwell & Co. v. Warren County*, 77 A. 665, 666 (Pa. 1910)).

**B.      Factual and Procedural Background**

In 1893, Thomas E. Proctor and Jonathan A. Hill became the owners of an unseated 410-acre tract of land located in what is now LeRoy Township, Bradford County, known as the Josiah Haines Warrant ("Haines Warrant").  The next year, Proctor, Hill, and their respective wives conveyed the surface estate of several tracts of land, including the Haines Warrant, to Union Tanning, expressly reserving for themselves the subsurface rights to minerals, oil, gas, coal, and petroleum ("mineral rights or subsurface rights").  Proctor died two months after the transfer to Union Tanning, devising his subsurface rights in the Haines Warrant to his heirs in trust.

Following Proctor's and Hill's sale of their interest to Union Tanning, tax assessment records identified Union Tanning as the owner of the Haines Warrant, describing the warrant as "unseated lands ass[ess]ed to the Union Tanning Company." Union Tanning paid the taxes assessed on the Haines Warrant from 1894 through 1902. In May 1903, Union Tanning conveyed the Haines Warrant to its affiliate, Central Pennsylvania Lumber Company ("CPLC"), subject to Proctor's and Hill's subsurface reservation.  From 1903 through 1906, CPLC paid the taxes on the Haines Warrant.  In 1907, however, CPLC failed to pay the taxes assessed on the warrant and the taxes went unpaid.  Consequently, Bradford County sold the Haines Warrant at a public sale on June 8, 1908, to Calvin H. McCauley, Jr. ("McCauley"), who at the time was CPLC's Treasurer. Importantly, the United States District Court for the Middle District of Pennsylvania ("District Court") determined that McCauley was acting as CPLC's agent when he purchased the Haines Warrant.[4]

---

[4] The District Court's finding as to McCauley's agency appears to conflict with the finding in *Keta Gas & Oil Company v. Proctor*, 2019 WL 6652174 (Pa. Super. 2019) (unpublished memorandum), where the trial court failed to find a genuine issue of material fact regarding whether McCauley was acting as an agent for CPLC when he purchased property at a 1908 tax sale in Lycoming County.  *Keta Gas*, 2019 WL 6652174 at *5.  The (continued…)

McCauley and his wife subsequently sold the Haines Warrant, along with several other tracts of land, back to CPLC in 1910 for one dollar.  During the time McCauley was the titled owner of the Haines Warrant, CPLC paid the taxes.  A decade after repurchasing the Haines Warrant from McCauley, CPLC sold the land to the Pennsylvania Game Commission ("Game Commission" or "Commission").  The deed conveying the warrant from CPLC to the Game Commission stated that the "conveyance" was "made subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface or any or all of the lands . . . as fully as said minerals and mineral rights were excepted and reserved in deed . . . from Thomas E. Proctor et al."

In 2012, the Game Commission filed the present action against the Thomas E. Proctor Heirs Trust ("Proctor Trust" or the "Trust")[5] in the District Court to quiet title to the subsurface rights of approximately 2,500 acres in Sullivan County.  The Proctor Trust counterclaimed for title to the same property and for the subsurface rights to other land in Sullivan and Bradford Counties, including the Haines Warrant.  After discovery, the parties filed cross motions for partial summary judgment, seeking to quiet title to the subsurface estate to the Haines Warrant, as both parties agreed that a determination as to that tract would be dispositive as to the outcome of the other tracts in question.  The District Court initially granted partial summary judgment in favor of the Game Commission.  Upon the Proctor Trust's motion for reconsideration, however, the District

---

question of whether McCauley acted as CPLC's agent when he purchased the Haines Warrant is not before us.  Thus, we base our analysis of the issues at bar on the District Court's finding in this matter that McCauley was acting as CPLC's agent.

[5] The Game Commission filed the action against the Proctor Trust and the Margaret O.F. Proctor Trust, the successors in interest to the Proctor heirs.  During the pendency of the case, the Margaret O.F. Trust transferred its interests to the Proctor Trust.  The District Court granted the Margaret O.F. Trust's unopposed motion to voluntarily dismiss itself from this action.  For ease of discussion, we will refer to the trusts collectively as the Proctor Trust.

Court vacated its prior order, finding that genuine disputes of material fact existed which precluded the grant of summary judgment to either party. The court, therefore, denied the parties' respective summary judgment motions and scheduled the matter for trial.

Following a one-day bench trial, the District Court found in favor of the Proctor Trust and entered judgment in the Trust's favor on the issue of ownership of the Haines Warrant's subsurface estate. More specifically, the court determined that CPLC had a duty to pay the delinquent 1907 taxes, which resulted in the 1908 tax sale, and thus was barred under the Powell Rule from purchasing more than its prior interest in the Haines Warrant's surface estate at the tax sale. According to the court, when McCauley, acting as CPLC's agent, purchased the entire warrant at the tax sale, his purchase effected only a redemption of CPLC's prior surface interest. Since McCauley's purchase acted only as a redemption, it left title as it stood prior to the sale, including the Proctor heirs' interest in the warrant's subsurface estate. Upon request of the Game Commission, and pursuant to 28 U.S.C. § 1292(b), the District Court certified a single question for interlocutory appeal to the Third Circuit Court of Appeals ("Third Circuit"):

> Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner – or the owner's agent – from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

District Court Order, 1/28/22, at 3. After oral argument, the Third Circuit held the matter C.A.V.[6] pending resolution of *Pa. Game Commission v. Thomas E. Proctor Heirs Trust*, 493 M.D. 2017, 2020 WL 256984 (Pa. Cmwlth., January 16, 2020) (unpublished

---

[6] C.A.V. is the abbreviation for the Latin phrase *curia advisari vult*, meaning "the court will be advised" and signals a "court's decision to delay judgment pending further considerations." *Curia advisari vault*, BLACK'S LAW DICTIONARY (12th ed. 2024).

memorandum).[7]  In response to the court's stay order, the parties filed a joint motion to vacate the stay and, to the extent the court sought guidance on Pennsylvania law, to certify the question before it to this Court.  The Third Circuit granted the parties' request to vacate the stay order and petitioned this Court, pursuant to its local rules and Pa.R.A.P. 3341, to certify the following question for our review:

> [W]hether, on the record provided here, a 1908 tax sale of an unseated parcel of land, induced by the surface owner's failure to pay taxes on the estate, and made to an agent of the defaulting surface owner, constitutes a title wash, thereby divesting the subsurface owner of his interest in the estate.

Petition for Certification of Question of State Law, 10/11/23, 15-16.  We granted the petition, accepted the question for consideration, and designated the Game Commission as the Appellant and the Proctor Trust as the Appellee.  *Commonwealth of Pa., Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 308 A.3d 293 (Pa. 2023) (*per curiam).*[8]

## II.  Parties' Arguments

### A.    The Game Commission's Argument

According to the Game Commission, under Pennsylvania law at all relevant times, landowners did not have a legal duty to pay taxes on unseated land.  Rather, it asserts Pennsylvania law created a legal fiction whereby the land itself, as opposed to the landowner, was liable for those taxes.  *See* Game Commission Brief at 23-25 (listing

---

[7] The Game Commission filed a "Petition for Review in the Nature of a Complaint to Quiet Title and for Declaratory Relief" in the Commonwealth Court's original jurisdiction seeking to quiet title to the surface and subsurface estate of a 2,000-acre tract within Lewis and Gamble Townships in Lycoming County.  The Game Commission filed a motion for summary judgment, and the Trust filed a motion for summary relief.  The Commonwealth Court denied both motions.

[8] Pursuant to Rule 3341, the Court, *inter alia*, "shall not accept certification unless all facts material to the question of law to be determined are undisputed[.]"  Pa.R.A.P. 3341.  As such, our consideration of the certified question will be based on the facts summarized above, as found by the District Court.

authorities).  In the Game Commission's view, this legal fiction was designed to promote the collection of taxes and the development of the land, because most unseated land was "owned by speculators who lived on the coast in hopes that the land would increase in value as the population increased."  *Id.* at 26 (quoting *Herder Spring*, 143 A.3d at 364). The Game Commission assigns particular importance to our statements in *Powell, supra*, that "taxes on unseated lands … [are] not a charge against the owner[,]" the landowner had "no personal responsibility" to pay the taxes, and that "[t]he land alone was liable." *Id.* at 33 (quoting *Powell*, 34 A. at 451 (ellipses and first brackets provided by Game Commission)).    Accordingly, the Game Commission contends that this Court unequivocally held that "*neither [the surface owner nor the subsurface owner] was under any obligation to the state to pay"* the taxes and, therefore, "there was nothing in reason or law to prevent [the surface owner] from purchasing [the entire property] at the tax sale." *Id.* (quoting *Powell*, 34 A. at 451-52) (emphasis provided by Game Commission).  As such, the Game Commission asserts *Powell* stands for the principle that an owner of unseated land could intentionally default on the taxes so as to acquire better title, *i.e.*, title to the surface and subsurface estates, at a resulting tax sale.

The Game Commission further argues that this Court reaffirmed its interpretation of *Powell* in *Herder Spring* when we stated "as to unseated land where the tax was imposed on the land and therefore not the landowner's responsibility, noting (*sic*) prevented the holder of a defective title from purchasing a better one at a tax sale[,]" *id.* at 37 (quoting *Herder Spring*, 143 A.3d at 367 (internal quotations and citations omitted)), and recounted that the *Powell* Court "explained the duty, *or lack thereof*, of landowners to pay taxes." *Id.* (quoting *Herder Spring*, 143 A.3d at 367) (emphasis provided by the Game Commission)).  Relying on several definitions from Black's Law Dictionary, the Game Commission declares that the law universally ties liability and duty together.  As

such, according to the Game Commission, when this Court has said that unseated landowners do not have responsibility, obligation, or liability for taxes assessed on their unseated land, the Court was, by definition, stating that those landowners did not have a legal duty to pay those taxes. Consequently, the Game Commission endorses the premise that the "*Herder Spring* Court's construction of the Powell [R]ule can be understood as saying that, because no person had a 'duty' to [the State] to pay taxes on unseated property . . ., the Powell [R]ule never applied to a tax sale of unseated land." *Id.* (quoting Certification Petition at 13).

Next, the Game Commission asserts none of the authorities relied on by the District Court call into question its interpretation of our holdings in *Powell* and *Herder Spring* that owners of unseated land did not have a duty to pay taxes assessed on their land. The Game Commission rejects the Trust's position that the Act of 1887 evidenced the legislature's understanding that landowners had a duty to pay taxes on unseated land when the General Assembly stated "all taxes levied upon unseated lands . . . shall be paid by the owner or owners of such unseated lands within the year for which the same are levied." *Id.* at 44 (quoting Act of 1887, § 1). In the Game Commission's view, if the legislature had intended to change settled law that unseated land itself, and not the landowner, was the debtor for the public charge, then the legislature would have done so explicitly rather than implicitly within an act addressing statutory interest rates. To the contrary, instead of overturning settled law, the Game Commission argues the legislature was merely speaking in plain English since it would not make sense to say that the taxes shall be paid by the land within the year. *Id.* at 45. The Game Commission also observes that this supposed legal sea change was not mentioned by this Court in *Powell*, decided a mere nine years later, or in *Herder Spring*, where the Court engaged in an extensive discussion of the land tax laws of this era. In addition, the Game Commission asserts

that if the Act of 1887 did in fact impose personal liability on landowners for taxes on unseated lands, the legislature also would have had to alter the entire tax scheme because once personal liability is imposed then personal notice is required, and personal notice was not required for the tax sale of unseated land.

Lastly, the Game Commission posits that even if the Court somehow finds that unseated landowners owed a duty to the state to pay taxes, the Proctor Trust's claim in equity is time barred. According to the Commission, pursuant to the Act of 1815, absent a jurisdictional defect, any challenge to a tax sale had to have been brought within two years of the sale. Per the Commission's position, since all of the requirements for a valid tax sale were met in 1908, no jurisdictional defect exists and any claim collaterally attacking the sale is time barred. The Commission asserts that to hold otherwise and set aside a tax sale over one hundred years after the fact, would be inviting chaos. Accordingly, the Game Commission implores this Court to answer the certified question in the affirmative and hold that the current record supports a finding that the 1908 sale to McCauley resulted in a title wash, extinguishing the Proctor Trust's subsurface interest, and reuniting the title to the Haines Warrant's surface and subsurface estates in McCauley's name.[9]

**B.    The Proctor Trust's Argument**

The Proctor Trust counters that the District Court correctly determined that the 1908 tax sale operated merely as a redemption of CPLC's pre-existing surface interest and did not work to strip the Proctor heirs of their subsurface estate. According to the Trust, fundamental principles of equity precluded CPLC from expropriating the Trust's subsurface estate by means of its own tax default. Under the Trust's interpretation of

---

[9] *Amici curiae* Commonwealth of Pennsylvania, Department of Conservation and Natural Resources; EQT AMD LLC and EQT ARO LLC, International Development Company, LLC; and Marcellus Shale Coalition all filed briefs in support of the Game Commission.

*Powell*, a property owner cannot seize his neighbor's property "by a purchase at a tax sale caused by [the owner's own] failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay."  Proctor Trust's Brief at 19 (quoting *Powell,* 34 A. at 451 (brackets provided by Proctor Trust)).  In the Trust's view, such a tax sale purchase operates solely as a redemption of the defaulting owner's pre-existing interest and landowners cannot circumvent this rule by using an agent to make the tax sale purchase.  The case at bar, the Trust asserts, presents a quintessential case for the application of the Powell Rule, as CPLC reported its ownership interest in the Haines Warrant to the county commissioners, causing taxes to be assessed to CPLC, which CPLC failed to pay in 1907 precipitating the 1908 tax sale.  At the sale, CPLC then purchased the Haines Warrant through its agent McCauley.  According to the Trust, CPLC's purchase did not and could not strip the Proctor heirs of their undisputed title in the neighboring subsurface estate, a result the Trust contends would be patently unfair.

As to whether owners of unseated land had a duty to pay the taxes assessed on their land, the Trust argues caselaw and legislation confirm that such a duty did in fact exist.  *See* Proctor Trust Brief at 23-25 (collecting authorities).  To this end, the Trust avers the Act of 1887 codified the General Assembly's understanding that landowners owed such a duty, as the plain language of the statute obligates unseated landowners to pay the taxes assessed on their land within one year of the assessment.  Thus, the Trust contends the Game Commission's reliance on language in the caselaw that unseated land itself is liable for the taxes conflates a landowner's duty to pay taxes with personal liability for the failure to pay those taxes.  Agreeing with the District Court, the Trust reasons that personal liability differs from a duty to pay taxes in that personal liability is a potential consequence for breaching that duty.  Therefore, the Trust explains, when the caselaw talks of the land being liable for the taxes, the Court is referring to unseated

landowners' lack of personal liability for breaching their duty to pay their taxes.  The Trust argues that this Court made this distinction clear in our opinion in *Kittanning Coal Co. v. Commonwealth*, 79 Pa. 100 (Pa. 1875), when we stated:

> Persons pay taxes, not property.  *This is so even when the remedy for the recovery of the tax is in rem.  The law only takes hold of the property as a means of enforcing the duty of the person* …[One cannot] separate the property from its owners, or [say] that property and not persons should pay taxes.  This would be simply absurd, for inanimate things cannot perform duties.

Proctor Trust's Brief at 31 (quoting *Kittanning*, 79 Pa. at 104-05) (emphasis and brackets provided by Proctor Trust).  In this vein, the Trust declares that its proposed distinction "reconcil[es] Pennsylvania's pre-1947 taxing system with the equitable rule in *Powell*[,]" *id.* at 32 (quoting Certification Petition at 15 (first brackets provided by Proctor Trust)), and harmonizes the caselaw that unseated landowners had a duty to pay taxes with the statements that such owners did not face *in personam* or personal liability if they defaulted on that duty.  *Id.*

The Proctor Trust further argues the Game Commission misconstrues this Court's holdings in *Powell* and *Herder Spring*.  In the Trust's opinion, neither of those cases addressed the question of whether someone who owned unseated land at the time of assessment had a duty to pay the assessed tax.  As the Trust explains, in *Powell*, the tax sale purchaser did not own the property when the unpaid taxes causing the sale were assessed.  Based on this fact, the Trust asserts the Court concluded that the tax sale purchaser did not have a duty to pay the tax and held the Powell Rule inapplicable.  As to *Herder Spring*, the Trust reasons, given the facts at issue, the question of an owner's duty to pay tax was irrelevant to the Court's holding.

Additionally, in the Trust's view, title washing can only be used to clear defects or clouds on a title, and the Game Commission is attempting to distort the concept beyond

recognition.  Based on its interpretation of the caselaw and the present record, the Trust contends McCauley's tax sale purchase on behalf of CPLC triggered the Powell Rule because the tax sale was induced by CPLC's default on its duty to pay the taxes assessed to it.  The Game Commission's position, according to the Trust, is fundamentally unjust and inequitable.  In support of its view, the Trust, relying on language from the deed from CPLC to the Game Commission, emphasizes that the parties'—all sophisticated actors— contemporaneous understanding was that the tax sale did nothing to divest the Proctor heirs of their interest in the Haines Warrant's subsurface estate and instead acted as a mere redemption of CPLC's interest in the Warrant's surface estate.[10]

Lastly, as to the Game Commission's argument that the Act of 1815's two-year limitation period bars the Trust's action in equity, the Trust argues the limitations period is inapplicable because the question in this case is how the tax sale purchase operated at the time it was made rather than whether there were any irregularities in the sale process.  According to the Trust, because McCauley's purchase operated as a redemption on the date of the sale, the two-year limitations period has no application since there is no question that the redemption was timely.  In this regard, the Trust echoes the District Court's finding that the Trust's arguments do not challenge the validity of the tax sale but rather illuminate what interest the tax sale conveyed in the first place.[11]

---

[10] In response, the Game Commission contends that the Trust's concession that unseated landowners may purchase their own land at tax sale in order to wash defective title exemplifies the fact that the Trust's duty analysis cannot withstand scrutiny.  Game Commission's Reply Brief at 21 (citing Proctor Trust Brief at 37).  According to the Game Commission, the Trust does not explain why "'adverse claimants to the same title' are relieved of their purported duty to pay the taxes to the state."  *Id.* (quoting Proctor Trust Brief at 38) (emphasis omitted).  In the Game Commission's view, the reason why an owner who sought to clean his title could purchase a better title at a tax sale was because the landowner did not owe a duty to pay the delinquent taxes.

[11] *Amici curiae* Thorne Heritage Resources LLC, together with Hoyt Royalty, LLC (collectively, "Thorne-Hoyt") and Title Professionals Michael Donovan and David Reed (continued…)

### III. Discussion

To briefly reiterate, through the Acts of 1804 and 1815, our legislature adopted the process of title washing, whereby the sale of unseated land at a tax sale extinguished all prior titles in the property and granted the tax sale purchaser exclusive title.[12]    In instances where a property's subsurface estate had been severed from the surface estate, the tax sale would serve to reunite the separate estates in a title granted to the tax sale purchaser. *Herder Spring*, 143 A.3d at 368.  Additionally, nothing prevented "the holder of a defective title from purchasing a better one at a tax sale." *Powell*, 34 A. 451 (quoting *Coxe v. Gibson*, 27 Pa. 160 (Pa. 1856)).   Historically, this Court has recognized a narrow exception to its general approval of title washing, known as the Powell Rule:

---

filed briefs in support of the Proctor Trust.  The Game Commission filed an application to strike the exhibits attached to the Thorne-Hoyt brief, arguing the exhibits, which consisted of four news reports, were not part of the record in either the District Court or the Third Circuit.

In a responsive filing opposing this application, Thorne-Hoyt explained that they attached the reports in an effort to direct this Court to publicly available statements made by the Game Commission for historical context with respect to the issues before the Court. The Proctor Trust joins Thorne-Hoyt's opposition to the application to strike.  We have previously stated that "*amicus* briefs cannot raise issues not set forth by the parties." *Banfield v. Cortes*, 110 A.3d 155, 172 n. 14 (Pa. 2015) (citing *Hosp. & Healthsystem Ass'n of Pa. v. Dep't of Pub. Welfare*, 888 A.2d 601, 606 n.10 (Pa. 2005); *see also id.* (quoting 4 Am.Jur.2d *Amicus* § 7 (2005) ("[A]n *amicus* must accept the case before the court with the issues made by the parties.  Accordingly, an *amicus curiae* ordinarily cannot inject new issues into a case which have not been presented by the parties[.]").  As the exhibits attached to the Thorne-Hoyt brief were not part of the record before the District Court, we agree with the Game Commission that it would be improper for us to consider them at this juncture.  We, therefore, grant the Commission's application to strike to the extent it seeks to strike the at issue exhibits.

[12] Along with creating a process for the sale of unseated land at tax sale and adopting the concept of title-washing, the legislature also instituted a requirement that individuals who became the owners of unseated land had to report that transaction to the county commissioners.  *Herder Spring*, 143 A.3d at 368 (citing Act of 1806, § 1, set forth in substantial part at 72 P.S. § 5020-409).

> The rule that one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest, rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty.

*Id.* at 451.  At the same time, we cautioned that the rule "should be restricted to cases where it was the duty of the purchaser to pay the tax."  *Id.* (citing *Oswald v. Wolf*, 21 N.E. 839 (Ill. 1889); *Lybrand v. Haney*, 31 Wis. 230 (1872); *Sands v. Davis*, 40 Mich. 14 (1879); *Moss v. Shear*, 25 Cal. 38 (1864); *Bowman v. Cockrill*, 6 Kan. 311 (1870)).  Mindful of these principles, the issue before us revolves around whether McCauley, ostensibly the purchaser at the 1908 tax sale, owed a duty to pay the taxes due, thus triggering the Powell Rule.  In order to settle this issue, we must first resolve a question that has never been directly answered by the Court:  whether owners of unseated land had a legal duty to the state to pay the taxes assessed on their land.

To resolve this query, we begin with a review of our opinion in *Powell*.  There, taxes, assessed on unseated land in 1882 and 1883, went unpaid.  *Id.*  Subsequently, in November 1883, the then landowner conveyed the surface estate, reserving the coal and minerals, thus severing the surface and subsurface estates.  Later that year, John Lantzy became the owner of the surface estate while the Powells became part owners of the subsurface estate.  *Id.*  In 1884, as a result of the unpaid 1882 and 1883 taxes, the property was sold at tax sale, where Lantzy purchased the property as a whole.  *Id.*  The issue was whether Lantzy's title in whole of the property was valid against the prior subsurface owners, the Powells, since he was the prior surface owner.  *Id.*  We concluded Lantzy's title was valid because he owed no duty to pay the 1882 and 1883 taxes.

In coming to this conclusion, the Court stated, *inter alia*, that the whole property "was subject to a claim for taxes which existed before [Lantzy and the Powells] acquired title, and which neither was under any obligation to the state to pay."  *Id.* at 452.  There are two possible interpretations of this statement: (1) neither Lantzy nor the Powells owed

a duty to the state to pay the taxes because the taxes were assessed prior to their ownership of the property; or (2) neither party owed a duty to the state to pay the taxes because owners of unseated land generally did not owe such a duty.  The cases from other jurisdictions this Court relied upon for the premise that application of the Powell Rule should be restricted to cases where the landowner had a duty to pay the taxes do not shed clear light on the correct interpretation.  Some of those cases involved situations where the taxes were assessed prior to the conveyance to the landowner in question. *See Oswald*, 129 Ill. at 215 (the defendant did not have a duty to pay the taxes as they were assessed prior to his ownership of the property); *Lybrand*, 31 Wis. at 233 ("[Plaintiff] was under no legal obligation to pay taxes assessed upon the lands before he became the owner thereof[.] . . . Hence the taking of tax deeds upon the certificates issued on the sales for nonpayment of the taxes for the last mentioned years, instead of paying such taxes, was no violation of any duty or obligation."); *Sands*, 40 Mich. at 19 (the tax sale was already in existence when the plaintiff purchased the property).  On the other hand, others found the question of who possessed the property at the time of assessment immaterial.  *See Bowman*, 6 Kan. at 331 (the plaintiff alleged the defendant was in actual possession of the property at the time it was assessed but the court stated "there is no evidence that tends to show that [the defendant] was under any obligation, legal or moral, to pay the taxes on [the property.]"); *Moss*, 25 Cal. at 46-7 ("[T]he defendant, notwithstanding he may have been in the occupation of the land at the time the assessment was made, . . . was under no obligation to pay the taxes, and therefore was not precluded from purchasing the tax title.").

In addition to the above cases, the *Powell* court discussed, at some length, the Supreme Court of Michigan's opinion in *Blackwood v. Van Vleit*, 30 Mich. 118 (Mich. 1874), which criticized its prior caselaw holding a landowner could not purchase his or

her own property at a tax sale precipitated by the failure to pay taxes assessed prior to his or her ownership. The *Blackwood* court found the cases relied upon for that holding all involved a party "either in possession of the land when the tax was assessed, and upon that ground chargeable with its payment or by contract or otherwise it had become his duty to other parties concerned to make payment[.]" *Blackwood*, 30 Mich. at 122 (internal citations omitted). Thus, the *Blackwood* court found those cases did not support its prior holding that a landowner could not purchase his or her own property at a tax sale resulting from unpaid taxes predating his or her ownership. *Id.*

The *Powell* court's recitation of the *Blackwood* court's analysis militates towards concluding *Powell*'s lack-of-duty reference related to the timing of the assessment of the taxes at issue rather than a general statement that unseated landowners did not have a duty to the state to pay the taxes levied on their property. This was the Iowa Supreme Court's interpretation of *Powell* when it found the case, among others, "state[d] a rule peculiarly applicable to owners of land purchased after an incumbrance has attached, and for the discharge of which he is under no obligation arising from his acquisition of the property, and as to such he may perfect or better his title by a purchase at a tax sale." *Cone v. Wood*, 79 N.W. 86, 88 (Iowa 1899).

Given the facts at issue in *Powell*, we find the correct interpretation of this Court's statement that the whole property "was subject to a claim for taxes which existed before [Lantzy and the Powells] acquired title; and which neither was under any obligation to the state to pay[,]" *Powell,* 34 A. at 452, is that neither party had an obligation to pay the taxes because they were assessed prior to their ownership rather than holding that

owners of unseated land did not have a duty to pay the assessed taxes.[13]  This conclusion is in line with Black's Tax Titles treatise, cited in *Powell*, which states:

> It is also held that the rule that the owner of land cannot derive any benefit from the acquisition of a tax title thereto, under a sale for taxes he ought to have paid, does not apply to one who purchases the land subsequent to the levy of the tax, and who is under no legal or moral duty to pay it.  It has been said by the court in Illinois: "The reason why an owner of land is disqualified to purchase it at a tax sale is that permitting him to become such purchaser would enable him to take advantage of, and reap a benefit from, his own neglect of a legal duty; but, where the owner holds by a title acquired subsequent to the levy of the tax and has not assumed its payment, or in any way become liable to see it paid, that reason manifestly does not exist.  There no legal or moral duty is neglected by failing to pay the tax."

HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF TAX TITLES § 274 (2d ed. 1893) (quoting *Wolf*, *supra*) (footnotes omitted).

*Powell* makes another reference to a lack of legal duty to pay the taxes, but that reference must be read in the context in which it was made:

> Any moral obligation to agree and jointly pay the tax, each contributing his just share, rested equally upon the owners of the different parts; but **there was no legal duty on either to do this**.  It was their separate, not their joint, interests which were in peril.  They were not interested for or with each other, and **no relation of confidence existed between them which gave rise to a duty which equity will enforce through the medium of a trust**.

---

[13] For this same, reason we reject the Game Commission's heavy reliance on our statement in *Herder Spring* that "the [*Powell*] [C]ourt explained the duty, or lack thereof, of landowners to pay taxes[,]" Game Commission's Brief at 37 (quoting *Herder Spring*, 143 A.3d at 367 (brackets added)), as evidence that the Court was acknowledging the principle that unseated landowners did not owe a duty to pay the taxes levied on their property.  Our statement in *Herder Spring* came immediately prior to quoting our statement in *Powell* that "[t]he whole was subject to a claim for taxes which existed before they acquired title, and which neither [the surface nor the subsurface owner] was under any obligation to the state to pay."  *Herder Spring*, 143 A.3d at 367 (quoting *Powell*, 34 A. 450) (brackets provided by *Herder Spring*)).  Therefore, our statement in *Herder Spring* regarding "the duty, or lack thereof" was in reference to taxes levied prior to the current landowner's ownership rather than a recognition that unseated landowners did not owe a duty to pay the taxes levied against their property.

*Powell*, 34 A. at 452 (emphasis added).  Reading this passage in its entirety makes clear this Court's reference to a lack of duty to pay the taxes was in reference to the parties' lack of duty to each other to pay the entirety of the taxes rather than any lack of duty owed to the state.  As such, we reject the Game Commission's argument that *Powell* stands for the premise that unseated landowners did not owe a duty to the state to pay the taxes assessed on their land.

This determination does not end our inquiry.  Just because *Powell* does not stand for that premise does not automatically result in a conclusion that unseated landowners had such a duty to the state.  In fact, there is caselaw from this Court that can be read as holding such a duty both did and did not exist.  As the Game Commission observes, this Court has continuously stated for over two hundred years that, when it comes to unseated lands, "it is land, and not the owner, that is taxed[,]" *M'Coy v. Michew*, 7 Watts & Serg. 386, 391 (Pa. 1844), and taxes on unseated lands "offer no personal responsibility, the land itself is made debtor, and the process of recovery is directly against the [land]." *Erwin v. Helm*, 13 Serg. & Rawle 151, 154 (Pa. 1825).[14]  We reiterate this principle in *Herder*

---

[14] *See also Burd v. Ramsay*, 9 Serg. & Rawle 109, 114 (Pa. 1822) ("[T]axes on unseated lands, have never . . . been considered a charge on the person of the owner[.]"); *Stokely v. Boner*, 10 Serg. & Rawle 254, 256 (Pa. 1823) ("[F]or unseated lands . . . the tax is laid specifically on the thing, and not on the person of the owner."); *Fager v. Campbell*, 5 Watts 287, 288 (Pa. 1836) ("The [unseated] land itself, and not the owner of it, is debtor for the public charge[.]"); *Hunter v. Cochran*, 3 Pa. 105, 107 (Pa. 1846) (recounting jury charge stating "[i]t is settled, that the charge of tax upon unseated lands is no charge upon the person of the owner, but the land itself liable for the payment of it."); *Stoetzel v. Jackson*, 105 Pa. 562, 567 (Pa. 1884) ("[I]f [the land is] unseated, [taxes are collected] from the land itself."); *Powell*, 34 A. at 451 ("In speaking of taxes on unseated lands [they] are not a charge against the owner[.]"); *David Oil Co. v. Fogle*, 47 A.2d 209, 210 (Pa. 1946) ("As the land was *unseated*, there was no personal liability . . . for the amount of the delinquent taxes . . . the land was liable for such payment." (emphasis in original)); *Bannard v. NY State Natural Gas Corp.*, 293 A.2d 41, 42 (Pa. 2019) ("If unseated . . . no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes.").

*Spring*, where we stated that "tax on unseated land was the liability of the land rather than the owners."  *Herder Spring*, 143 A.3d at 375.

That said, as the Trust observes, for just as long, this Court has also held that an unseated landowner "has duties . . . to pay up the taxes on his unseated lands[,]" *Baird v. Cahoon*, 5 Watts & Serg. 540, 541 (Pa. 1843), and a landowner of unseated land who fails to pay the taxes on such land is "guilty of a breach of a duty" and is "a defaulter." *Stewart v. Shoenfelt*, 13 Serg. & Rawle 360, 372, 374 (Pa. 1825).[15]  We likewise appeared to reaffirm this principle in *Herder Spring* when we approvingly quoted *Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841), by stating that

> [a] vigilant owner has nothing to fear.  All he has to do is pay his taxes, and this he is bound to do upon every principle of equality and justice.  Nay, more, when this has been omitted by him, the legislature has allowed him to redeem his land within two [or five] years, terms by no means onerous.

---

[15] *See also M'Coy*, 7 Watts & Serg. at 391 ("If there be hardship, it is one which can easily be avoided by performing the duty which the law imposes upon [the owner], to return the land and pay his taxes."); *Burd v. Patterson*, 22 Pa. 219, 223 (Pa. 1853) ("[The unseated-land owner knew] of the amount of taxes due upon [his property].  He knew that he was in duty bound to pay his share of the public burthens, and that he had not performed that duty."); *Mayor, etc., of City of Philadelphia v. Riddle*, 25 Pa. 259, 263 (Pa. 1855) ("[I]t is an owner's duty to pay taxes[.]"); *Donnel v. Bellas*, 34 Pa. 157, 159 (Pa. 1859) ("It was Witman's duty, as owner of the 'William Green tract,' to pay the taxes upon it[.]"); *City of Philadelphia v. Miller*, 49 Pa. 440, 449 (Pa. 1865) ("[H]ow can the duty of the payment of taxes [on unseated land] be performed without the identity of the subject-matter of the duty being made known to him who is to perform it…?"); *Maul v. Rider*, 51 Pa. 377, 383 (Pa. 1866) ("The taxes were assessed while Rider and Jacobs were joint owners. … It was as much Rider's duty and interest to pay them as it was the duty and interest of Jacobs."); *Breisch v. Coxe*, 81 Pa. 336, 346 (Pa. 1876) ("[T]he payment of taxes [on unseated land] is a duty, and a failure to perform it is the fault of the owner.").

The Game Commission argues that the Court's discussion of a landowner's duty in some of these cases, namely *M'Coy*, *Breish*, and *Riddle*, either references a duty other than a duty to pay taxes on unseated land, such as the duty to report, or the discussion of duty amounted to *dicta*.  While the Game Commission is correct that none of our prior cases directly addressed the question of whether unseated landowners owed a duty to pay taxes, this in and of itself does not take away from the fact that our Court, for over two centuries, has continuously referenced such a duty.

*Herder Spring*, 143 A.3d at 366 (quoting *Strauch*, 1 Watts & Serg. at 176).

The only way to harmonize[16] these seemingly incongruent line of cases is to distinguish between landowners' duty and their potential liability for failing to perform that duty. To do so, we look at a statement made in *Kittanning Coal Co.*, where we explained that "[p]ersons pay taxes, not property. This is so even when the remedy for the recovery of the tax is *in rem*. The law only takes hold of the property as a means of enforcing the duty of the person." *Kittanning Coal Co.*, 79 Pa. at 104. We find additional assistance in our harmonization quest from the first edition of Black's Law Dictionary, published in 1891, which defines "duty" as, *inter alia*, "a technical term of the law" that "signifies a thing due; that which is due from a person; that which a person owes to another. An obligation to do a thing. A word of more extensive signification than 'debt'[.]" *Duty*, BLACK'S LAW DICTIONARY (1st ed. 1891). The same text defines "liable" as, *inter alia*, "[b]ound or obliged in law or equity; responsible; chargeable; answerable; compellable to make satisfaction, compensation, or restitution." *Liable*, BLACK'S LAW DICTIONARY (1st ed. 1891). While there is certainly some overlap between these two definitions, since the Court has simultaneously stated both that unseated landowners had a duty to pay taxes levied on their unseated land but were also not liable for those taxes, the Court must have intended the terms to have different meanings. Consequently, we hold that when the Court spoke of a landowner's duty to pay taxes, we were using the term to mean "that which is due from a person; that which a person owes to another. An obligation to do a thing." In other words, landowners had an obligation to the state to pay the taxes levied.

On the other hand, when this Court stated unseated landowners were not liable for the taxes but rather it was the land itself that was liable, we were employing the term

---

[16] *See Commonwealth v. Jones*, 912 A.2d 815, 818 (Pa. 2006) (discussing this Court's attempt "to harmonize prior case law").

to mean "responsible; chargeable; answerable; compellable to make satisfaction[.]" Meaning unseated landowners could not be personally compelled to make satisfaction for the taxes owed, rather it was the land itself, through a tax sale, that could be compelled to make satisfaction for those taxes.  Thus, our prior caselaw stands for the principle that unseated landowners owed a duty to the state to pay the taxes levied on their property, as they had an obligation to pay those taxes, but they were not personally liable for those taxes as they could not be compelled to make satisfaction of the unpaid taxes.

In addition to harmonizing our caselaw, our determination that unseated landowners owed a duty to pay their taxes is confirmed by legislative enactment from the time.  The Act of 1887[17] states:

> After June first, 1888, all taxes levied upon unseated lands, within the counties of this Commonwealth, **shall be paid by the owner or owners of such unseated lands** within the year for which the same are levied; and in case of the refusal or failure of any person or persons, companies or bodies corporate, owner or owners of such unseated lands to pay the taxes so levied within the year of which the same are levied and collectible, then interest at the rate of six per centum, per annum, is to be charged upon the amount of said taxes, or any part thereof, remaining due and unpaid from and after the first day of the year following that for which said taxes were levied until the same has been paid in full, or the land sold as now provided by law for the sale of unseated lands: Provided, No interest shall be charged upon taxes levied for the years 1886 and 1887.

Act of 1887, § 1 (emphasis added).  The plain language of the Act clearly directs that owners of unseated land shall pay the taxes levied on said land, and if they fail to pay those taxes, they will be charged interest on the unpaid amount and the land could be sold at a tax sale.  The plain language of the statute obligated unseated landowners to pay the taxes levied on their unseated land or risk losing that land at a potential tax sale. The duty is on the landowner to pay those taxes.  Rather than changing longstanding precedent or hiding an elephant in a mousehole, as the Game Commission insists, the

---

[17] Act of June 6, 1887, P.L. 363.

Act exhibits the legislature's contemporaneous understanding that unseated landowners owed a duty to the state to pay the taxes levied on their land.

Applying the foregoing to the issue at hand, the existence of that duty resulted in McCauley being barred from purchasing the entirety of the Haines Warrant at the 1908 tax sale. That is because, as discussed earlier, pursuant to the Powell Rule, "one cannot, by purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]" *Powell*, 34 A. at 451. The rule is restricted only to cases where the tax sale purchaser owed a duty to pay the taxes owed. *Id.* In such circumstances, the "purchase operates as a payment only." *Id.* In 1907, CPLC failed to pay the taxes assessed on the Haines Warrant that, as the owner of the Haines Warrant's surface estate, it was duty bound to pay. That failure resulted in the 1908 tax sale where, pursuant to the Powell Rule, CPLC was not permitted to purchase title to more than the Haines Warrant's surface estate it owned prior to the sale or acquire title adverse to the Proctor heirs, who held an interest in the warrant's subsurface estate.[18, 19]

---

[18] We acknowledge that the District Court did not find that only the Haines Warrant's surface estate was assessed in 1907 or offered for sale by the treasurer in 1908. D.C. Memorandum, 12/3/21, at 32. However, whether the warrant's subsurface estate was taxed resulting in the Proctor heirs owing their own duty to pay the taxes is irrelevant to the determination that CPLC breached its duty, thus triggering the *Powell* Rule. If the Proctor heirs had such a duty and breached it, they too would have been barred from purchasing the entirety of the Haines Warrant at tax sale per the *Powell* Rule. That said, any such breach would in no way negate the Powell Rule's application to CPLC. Further, as we resolve the certified question on the basis of CPLC's breach of its duty to pay the 1907 taxes, it is unnecessary for us to address the Proctor Trust's alternative arguments that the Act of 1806's reporting requirements independently serve to trigger the Powell Rule.

[19] Our ruling should not be read to overrule our prior caselaw holding that there was "nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale." *Powell*, 34 A. at 451 (quoting *Coxe*, 27 Pa. at 160). Nothing in the record supports the conclusion that CPLC's title in the Haines Warrant's surface estate (continued…)

Rather, any purchase by CPLC at the 1908 tax sale operated only as payment of the taxes owed or a redemption of its pre-existing interest in the warrant's surface estate. Further, CPLC could not evade application of the Powell Rule by having its agent, McCauley, make the purchase.  *See* BLACK, A TREATISE ON THE LAW OF TAX TITLES, § 276.[20]  In other words, as CPLC's agent, McCauley's purchase of the Haines Warrant at the 1908 tax sale operated merely as a payment of the taxes owed by CPLC, resulting in a redemption of CPLC's pre-existing title in the warrant's surface rights.  *See Knupp v. Syms*, 50 A. 210, 212 (Pa. 1901) (presuming that agent's purchase at tax sale was in trust for his principal and "deemed equivalent to a redemption[.]"); *see also* BLACK, A TREATISE ON THE LAW OF TAX TITLES, § 287.[21]  Since McCauley's purchase merely redeemed CPLC's prior interest, his purchase did not impact, let alone extinguish, the Proctor heir's interest in the Haines Warrant's subsurface estate.

---

was defective or that it had McCauley purchase the property at tax sale in order to clear that defect.

[20] "It is a general rule that a person who, by reason of his legal or moral duty to pay the taxes on given land, is disqualified from purchasing the same directly at a tax sale, cannot acquire any valid title thereto indirectly, by procuring another person to figure as the ostensible bidder at the sale, and then taking an assignment of the certificate or deed from such person, on refunding him the money expended.  Such an arrangement, if not positively fraudulent, is at any rate an attempt to evade the law, to which the courts will lend no countenance."  BLACK, A TREATISE ON THE LAW OF TAX TITLES, § 276 (internal citations omitted).

[21] "An agent having the management and control of real estate, cannot become a purchaser thereof at a sale for taxes, without a previous explicit renunciation of the agency.  To capacitate him as a purchaser on his own account, he must have unequivocally resigned his trust.  The most open, ingenuous, and disinterested dealing is required of a confidential agent while he consents to act as such, and there must be an unambiguous relinquishment of his agency before he can acquire a personal interest in the subject of it.  To leave a doubt of his position in this respect is to turn himself into a trustee.  Much less can an agent, employed by the owner for very purpose of bidding it off when sold for taxes, acquire title to himself by taking the deed in his own name."  BLACK, A TREATISE ON THE LAW OF TAX TITLES, § 287 (internal citations omitted).

The fact that McCauley's purchase of the Haines Warrant acted as a mere payment of the taxes CPLC owed at the time of the 1908 tax sale requires this Court to reject the Game Commission's argument that the Proctor Trust's equity action is time barred by the Act of 1815.  As we explained in *Herder Spring*, the Act of 1815, set forth at 72 P.S. § 6091, provided for a two-year redemption period where landowners, if they paid the taxes, costs, and interest fees, would "be entitled to recover the [lands sold] by due course of law."  *Herder Spring*, 143 A.3d at 366 (quoting Act of 1815, § 4; 72 P.S. § 6091) (brackets provided by *Herder Spring*).  However, the Act of 1815 specified that after the two-year period:

> [I]n no other case and on no other plea, shall an action be sustained … [and] no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.

*Id.* (quoting Act of 1815, § 4; 72 P.S. § 6091) (brackets and ellipses provided by *Herder Spring*).  As such, the Trust is time-barred from challenging procedural irregularities in the notice, assessment, and tax sale process of the 1908 tax sale.[22]  *See Cornwall Mountain Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148, 160 (Pa. Super. 2017).  That said, the Game Commission's reliance on the two-year time bar suffers from a fatal flaw: the Trust is not challenging procedural irregularities related to the 1908 tax sale.  Rather, the issue raised by the Trust's equity claim is how McCauley's tax sale purchase operated at the time it was made.  The essence of the issue is the effect of the 1908 tax sale, which is not barred by the two-year limitations period.  *See, e.g.*, *Herder Spring*, 143 A.3d at 368-73 (analyzing the extent and legal consequence of a 1935 tax sale over eighty years after the fact).  Since McCauley's purchase acted as a redemption at the time it was made, Act 1815's two-year limitations period has no application to this case.

---

[22] After that time, only some jurisdictional defect would void the sale.  Neither party asserts the existence of a jurisdictional defect in the 1908 tax sale.

### IV. Conclusion

In light of the foregoing, we answer the certified question in the negative. Based on the record provided here, McCauley's purchase of the Haines Warrant at the 1908 tax sale did not constitute a title wash but, rather, amounted to a mere payment of the delinquent taxes owed by CPLC and acted as a redemption of CPLC's prior interest in the Haines Warrant's surface estate. Accordingly, that purchase did not divest the Proctor heirs of their then-existing interest in the warrant's subsurface estate. Jurisdiction relinquished.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Brobson and McCaffery join the opinion.

Judgment Entered 05/30/2025

DEPUTY PROTHONOTARY